Patrick **IHEKWU**, Plaintiff,

v.

The **CITY OF DURHAM, NORTH CAROLINA**, Defendant.

No. 1:99CV00420.

United States District Court, M.D. North Carolina.

Dec. 27, 2000.

Thomas Henry Moore, Haywood Denny & Miller, L.L.P., Durham, NC, for Plaintiff.

Thomas H. Lee, Jr., Newsom Graham Hedrick & Kennon, P.A., Patrick W. Baker, Office of City Attorney, Joel Miller Craig, Newsom Graham Hedrick & Kennon, P.A., Durham, NC, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before the Court pursuant to Defendant City of Durham's Motion for Summary Judgment [Document # 17]. Plaintiff Patrick Ihekwu ("Plaintiff" or "Ihekwu") filed suit in this case against Defendant City of Durham ("Defendant" or "City"), alleging discrimination and hostile work environment based upon disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, et seq.; discrimination based upon race and national origin in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the Civil Rights Act of 1866; 42 U.S.C. § 1981; property deprivation in violation of the Due Process Clause of the United States Constitution; and other state law claims in violation of the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C.Gen.Stat. § 143–422.1 et seq., the North Carolina Constitution, Article I, §§ 19, 35, 36, the Durham City Code of Ordinances, and the Municipal Personnel Records Privacy Act, N.C.Gen. Stat. § 160A–168.

For the reasons that follow, Defendant's Motion for Summary Judgment as to Plaintiff's claims under 42 U.S.C. § 12112, 42 U.S.C. § 2000e, 42 U.S.C. § 1983, and the Due Process Clause is GRANTED.

**874**

Because Defendant's Motion as to all of Plaintiff's federal law claims has been granted, this Court dismisses Plaintiff's state law claims without prejudice.

## I. *FACTUAL BACKGROUND*

Plaintiff Patrick Ihekwu, a black male, was born and raised in Nigeria. He later immigrated to the United States in the 1980s to attend college at Shaw University, in Raleigh, North Carolina. Ihekwu began work as a parking garage attendant for the City in 1990, and in 1994, he was promoted to a Records Keeper Specialist position with the City's Records Management Department ("RMD"). Ihekwu had no written contract of employment.

In January 1995, after visiting with his physician, Ihekwu learned that he had contracted the HIV virus. Although officials in the City's Human Resources Department were aware of his condition, Ihekwu opted not to share his condition with his co-workers. Despite Ihekwu's efforts to conceal his illness, his co-workers learned about it, nonetheless. Ihekwu suspects that unknown City employees obtained records of his prescription medications and conveyed this information to his co-workers. However, Ihekwu has no documentation or other evidence to support this belief and admits that he does not know how his co-workers learned of his malady. The City has presented evidence that Ihekwu's co-workers did not have access to his personnel file or his medical records. [Bell Aff. ¶ 4].

Ihekwu alleges that during the latter part of 1996, several of his African–American co-workers frequently taunted and teased him, talked negatively about him, and made gestures at him because of his malady and because of the fact that he was from Nigeria. Ihekwu has alleged that on several occasions, he verbally reported the taunts and comments to his immediate supervisor, John Parker. Eventually, Parker recommended that Ihekwu reduce his complaints to a written memorandum.

Based on Parker's suggestion, Ihekwu wrote two letters detailing the events of which he complained. In the first letter, dated January 29, 1997, Ihekwu alleged that the following things had taken place: (1) his co-workers spread rumors about him and commented that he was sick and dying; (2) his co-workers questioned him regarding his immigration status; (3) his co-workers failed to return his greetings; (4) his co-workers intentionally placed him in a computer room away from other employees to maintain his virus; (5) his co-workers talked amongst themselves in his presence; and (6) his co-workers made "gestures and gesticulations" to keep him depressed. [Ihekwu Dep.Ex. 19]. More generally in this letter, Ihekwu alleged that his co-workers violated his civil rights. *See id.*

In the second letter, dated February 4, 1997, Ihekwu noted that he had been mistreated during a pizza lunch held in honor of a departing employee. According to Ihekwu, he took three pizza slices from a pizza box on a table, left the pizza table temporarily, and returned to find the pizza box from which he had taken his slices lying on the floor. Ihekwu explained in the letter that his co-workers had asked from which box he had taken his pizza before selecting their own and had talked amongst themselves about AIDS and how Ihekwu pretended like nothing was wrong with him. From these facts, Ihekwu deduced that his co-workers had placed his pizza box on the floor to prevent others from eating from that box. However, he admits that he did not actually see anyone move the box. [Ihekwu's Letter to Parker, Ihekwu Dep., Vol. II, Ex. 20].

Ihekwu also discussed in the second letter a similar occurrence at a Thanksgiving Day office celebration in 1996. In the letter, Ihekwu noted that his co-workers had talked amongst themselves during the celebration and had plotted not to eat from those dishes from which Ihekwu had eaten. He also noted other incidents in which his co-workers refused to eat his popcorn or

candy and made negative remarks relating to his illness. *See id.* Although Ihekwu's letters did not contain any other complaints of discriminatory conduct, Ihekwu now alleges that other incidents of harassment also occurred.

For example, in one instance, Ihekwu claims that as he got choked on some water at the water fountain, Ann, an Assistant Director, ran away from the fountain exclaiming to others that they were going to get Aids if they stayed around while Ihekwu was coughing. In another instance, Ann sprayed disinfectant in her office after complaining about his use of her computer. [Ihekwu Dep., Vol. II, pp. 11–16]. According to Ihekwu, Ann claimed that he had contaminated her computer by touching it. Moreover, he claims that she and another co-worker expressed a fear of contracting HIV from a mosquito bite while riding on the elevator with him. Ihekwu also claims that Ann used a tissue to open the microwave and turn on the water faucet every time she used the kitchen facilities for fear of contracting HIV. In addition, he has alleged that Ann and other co-workers would make jokes about him and his imminent mortality. Lastly, Ihekwu claims that Tonette Amos and Eddie Williams, two of his co-workers, made jokes about getting infected with the virus. [Ihekwu Dep., Vol. II, pp. 22–23]. Other than these instances and those cited in his letters to Parker, Plaintiff cannot recall any additional incidents of harassment.

In response to Ihekwu's letters, Parker and Margaret Bowers, the RMD Department Head, met with Ihekwu's alleged tormentors and investigated Ihekwu's complaints. In addition, Parker, Bowers, and Ihekwu met with a director of the Personnel Office [1] to discuss Ihekwu's complaints. [Ihekwu Dep., Vol. II, pp. 37–38]. After this consultation, the City referred Ihekwu to its Employees Assistance Program for psychological counseling and placed Ihekwu on paid leave for one month. Although Ihekwu accepted the leave of absence, he opted not to undergo counseling because he felt that it would have no effect on his co-workers' behavior. Moreover, Ihekwu refused counseling because he did not want to submit his medical information as a condition of receiving the counseling. *See id.* at 40. Ihekwu returned to work in March, 1997. [Ihekwu Aff. ¶ 14].

Ihekwu presents conflicting testimony as to whether he underwent any additional harassment after he returned from leave. In his deposition on June 1, 2000, Ihekwu states that immediately upon return from leave, his alleged tormentors were fired and that he faced no additional harassment. [Ihekwu Dep., Vol. II, pp. 48–49]. However, in his affidavit of August 11, 2000, Ihekwu states that the harassment continued after he returned from leave and that no actions were taken to curtail, it. [Ihekwu Aff. ¶ 14].

Although Ihekwu claims to have been upset by the harassment, he does not claim that the harassment interfered with his work performance. In fact, he stated that he liked his job, despite the events about which he complained. [Ihekwu Dep., Vol. II, p. 42]. In addition, Ihekwu received favorable performance evaluations at all times and claims that he consistently performed his job at an outstanding level. [Ihekwu Dep. pp. 99–103]. Despite Ihekwu's satisfactory job performance, he did note in one of his letters to Parker that the conduct of his co-workers would have caused him to quit had he not needed the income to support his family. [Ihekwu's Letter to Parker, Ihekwu Dep., Vol. II, Ex. 19].

At some point during spring 1997, Ihekwu and the other employees in his department were notified that the RMD was being decentralized and that they would lose their jobs as part of a reduction in force. [Ihekwu Aff. ¶ 15]. During a meeting with his superiors about the decentralization, Ihekwu was told that the RMD clerks would be given priority status with the

---

1. Ihekwu cannot recall the name of this Director.

City and, thus, would be considered first for all transfer positions for which they applied and qualified. *See id.* Despite the City's assurances otherwise, it was Ihekwu's view that his written letters triggered a conspiracy by the City, whereby he believes that the City eliminated the jobs of his alleged tormentors, decentralized his department, and offered him either undesirable job reassignments or reassignments requiring medical history disclosure, in hopes of effecting his termination. [Ihekwu Dep. pp. 111–16]. The positions for which Ihekwu was considered included a position with the Cemeteries Department, a position issuing parking tickets, and a Records Clerk position with the Police Department. *See id.* According to Ihekwu, the parking tickets position was undesirable because it offered a low salary and required him to be outside. *See id.* at 113. He alleges that the City wanted him outside so that he would not infect other employees. *See id.* He further alleges that the City considered him for the position with the Cemeteries Department to cause him to reflect on his own mortality. *See id.* at 131. Ihekwu alleges that others in his department were transferred to other, more desirable positions immediately upon the decentralization of the RMD. *See id.* However, he has provided no information about who has been transferred to what department and what qualifications each transferee possessed.

Initially, Ihekwu expressed an interest in the Police Records Clerk position. He interviewed successfully and admits that he was offered the position. *See id.* at 137–40. Thereafter, he interviewed with Officer Poole, the Background Investigator for the Police Department, and Officer Poole issued Ihekwu the paperwork necessary for conducting a background check. As part of the background check, Ihekwu was required to authorize the release of his medical history. Because the Police Department required him to submit his medical history as a condition of employment, Ihekwu surmised that the transfer to the police department was pretextual and designed to

force him to disclose his medical records. *See id.* at 129. After his interview, Ihekwu consulted legal counsel and the federal Equal Employment Opportunity Commission ("EEOC") to discuss his concerns. *See id.* at 116–18. The EEOC advised Ihekwu to fill out all portions of the background check form, except for the portions dealing with his medical history. *See id.*

Having given Ihekwu a conditional offer of employment within the Police Department, the Human Resources Department sent Ihekwu a letter indicating that his Records Clerk position could not be held open indefinitely and that a signed medical history and background check release were needed immediately so that his background investigation could be completed. This letter was written because the Police Department had not heard from Ihekwu since his interview with Officer Poole. In the letter, Alethea Bell, Assistant Director for Human Resources, informed Ihekwu that background information was required of all employees placed in police department positions, that if he failed to provide the background information, he would not be given the position, and that failure to complete the investigation would result in him losing priority status. [Bell's Letter to Ihekwu, Ihekwu Dep.Ex. 7]. On August 7, 1997, the City sent Ihekwu a second letter providing a final deadline of August 15, 1997 for receiving the authorization and release information. [Pennington's Letter to Ihekwu, Pennington–Best Aff.Ex. A]. Ihekwu returned the partially completed application on or around August 14, 1997. [Ihekwu Dep. pp. 144–49, 180–86].

Ihekwu, however, refused to supply the City with his medical information. [Ihekwu Dep.Ex. 16]. Because of Ihekwu's untimely response to the Police Department's requests for him to complete the authorization and release portions of the background check, he was not hired for the Records Clerk position. After the City informed him that he had been taken off of priority status and that he was no longer

being considered for any City positions, Ihekwu again consulted legal counsel and filed a complaint with the EEOC, alleging that the City had refused to hire him because he suffered from HIV. [Ihekwu Aff. § 16].

Following its investigation, the EEOC issued Ihekwu a right-to-sue letter. Based on the EEOC's findings and in order to resolve Ihekwu's complaint, the City of Durham entered into a conciliation agreement, whereby it agreed that it would comply, in all respects, with the Americans with Disabilities Act, that it would not inquire into an individual's medical history as part of the pre-offer stage of the employment-selection process, and that it would not include medical information in any employee's personnel file.[2] [Conciliation Agreement, Ihekwu Aff. § 19, Ex. 5]. Moreover, by letter dated April 14, 1998, the City informed the EEOC that it would be willing to reconsider Ihekwu for the Police Records Clerk position.

On May 4, 1998, Ihekwu filed an amended Charge of Discrimination, alleging that he had been subjected to hostile-work-environment harassment by his co-workers in the Records Management Department. The EEOC then expanded its investigation to include Ihekwu's harassment claim. By letter dated February 16, 1999, the City again expressed its willingness to reconsider Ihekwu for the Records Clerk position.

In addition to his allegations of discriminatory discharge and hostile-work-environment harassment, Ihekwu also alleges that the City "blacklisted" him following its termination of his employment. [Ihekwu Dep. pp. 46–50]. In support of this allegation, Ihekwu claims that he has interviewed well for numerous jobs with various cities, but that none of these interviews has resulted in a job offer. [Ihekwu Dep. pp. 52–57]. Moreover, Ihekwu alleges that the Di-

rector of the EEOC informed him that the City had placed negative information in his employment file, thus prohibiting him from obtaining gainful employment. [Ihekwu Dep. pp. 46–49; Ihekwu Dep. pp. 67–70]. The exact nature of the alleged negative information was not included in the record.

Because none of the various city positions for which Ihekwu interviewed yielded favorable results, Ihekwu contends that he was forced to take a position as a life insurance salesman. [Ihekwu Dep. pp. 25–26]. Ihekwu claims that he is not well-suited for this position and that he has earned very little money doing it, despite the fact that he frequently works eighty-hour weeks. [Ihekwu Dep. pp. 34–39]. Ihekwu claims to have earned approximately $3,000 in 1998 and approximately $15,000 in 1999. *See id.* Based on the allegations Ihekwu makes against the City, he seeks recovery for disability and race discrimination, hostile work environment, due process violations, privacy violations, and intentional infliction of emotional distress. Ihekwu seeks $520,000 in damages. [Ihekwu Dep. p. 66].

## II. *DISCUSSION*

### A. *Standard of Review*

Summary Judgment is appropriate when "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, 211 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

2. It appears that the primary stimuli behind the conciliation agreement related to requiring prospective employees to submit pre-offer medical records and to the manner in which the medical records of current employees

were maintained. However, there is no indication in the record that Defendant acknowledged any wrongdoing in connection with Ihekwu's charge or the EEOC's findings.

In making a determination on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *See Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). However, mere allegations and denials are insufficient to establish a genuine issue of material fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d at 212. Judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Id.* at 251, 106 S.Ct. 2505, 91 L.Ed.2d at 213 (quoting *Schuylkill & Dauphin Imp Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). On the other hand, a motion for summary judgment should not be granted " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

## B. *Plaintiff's ADA Claims*

■ Plaintiff Ihekwu alleges that the City's refusal to hire him as a Police Department Records Clerk, its failure to place him in other City departments, and its blacklisting of him upon his termination constitute disability discrimination in violation of the Americans With Disabilities Act. Absent direct evidence of discrimination, Plaintiff must satisfy the three-step proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prevail on his ADA claims. Because Plaintiff has presented no direct evidence that the City engaged in the complained of acts for a discriminatory purpose, this Court will address Plaintiff's claims under the *McDonnell Douglas* framework. Under this framework, Plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir.1998) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). To establish a prima facie case, Plaintiff must show: (1) that he has a disability under the ADA; (2) that he sought or applied for one or more positions; (3) that he was otherwise qualified for the position(s) in question; and (4) that he was denied the position(s) about which he complains under circumstances giving rise to an inference of disability discrimination. *See Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 348 (4th Cir.1996) (per curiam), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997). Once Plaintiff has established his prima facie case, the burden of persuasion then shifts to Defendant to rebut the presumption of discrimination by producing evidence that Plaintiff was terminated for "a legitimate, nondiscriminatory reason." *Lane v. Wal–Mart Stores, Inc.*, 2000 WL 1481638 (D.Md.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. 1089)). "The defendant's burden is one of production and not of persuasion." *Id.* If the defendant is able to meet its burden, "the presumption raised by the prima facie case is rebutted and 'drops out of the picture,' and [Plaintiff Ihekwu] bears the ultimate burden of proving that [he] has been the victim of intentional discrimination." *Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 504–10, 113 S.Ct. 2742, 2746–49, 125 L.Ed.2d 407 (1993)). With this standard in mind, the Court next turns to Plaintiff's allegation that Defen-

dant's refusal to hire him as a Police Department Records Clerk constituted disability discrimination in violation of the ADA.

### 1. Refusal to Hire as a Police Department Records Clerk

■ There is no dispute here that Ihekwu has alleged adequately that he suffers from a disability, *see, e.g., Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding that HIV status qualifies as a disability under the ADA); *United States v. Happy Time Day Care Ctr.,* 6 F.Supp.2d 1073, 1078–79 (W.D.Wis.1998) (explaining why HIV is a per se disability), that he sought the Records Clerk position with the Police Department, or that he was otherwise qualified to work as a Police Department clerk. In fact, both parties acknowledge that Plaintiff interviewed for and maintained the requisite skills for the Records Clerk position. Therefore, in determining whether Defendant's Motion for Summary Judgment should be granted with respect to Plaintiff's discriminatory refusal to hire claim, this Court focuses on the fourth element of Plaintiff's prima facie case—whether Defendant's refusal to hire Plaintiff gives rise to a reasonable inference of disability discrimination.

Both parties acknowledge that Plaintiff was not hired because Plaintiff failed to submit his medical information after he had been extended a conditional offer of employment. Pursuant to 42 U.S.C. § 12112(d) of the Americans with Disabilities Act:

A covered entity may require a medical examination after *an offer of employment has been made* to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

 (A) *all entering employees* are subjected to such an examination regardless of disability.

42 U.S.C. § 12112(d). In the present case, both parties agree that the City made Plaintiff an offer before requiring him to submit his medical information; however, there is conflicting evidence in the record as to whether the City required *all* employees entering the Police Department to submit medical information as a condition of employment. The only evidence offered by Plaintiff as to this issue is: (1) an unsubstantiated statement by Officer Poole, a background investigator within the Durham Police Department; (2) Plaintiff's own testimony as to when the Police Department's manual on hiring requires employees to submit medical information as a condition of employment; and (3) an alleged statement by an unidentified City representative to Plaintiff's lawyer about Plaintiff's need to submit such information. The Court finds that this evidence is insufficient to establish the fourth element of Plaintiff's prima facie case for the following reasons. The Court will address each aspect of Plaintiff's position in turn.

■ First, according to Plaintiff, during his pre-employment interview with the Police Department, Officer Poole told Plaintiff that he did not *think* that it was the Police Department's standard procedure to require medical information from priority status employees as a condition of employment. [Ihekwu Dep. p. 189]. Plaintiff alleges that Officer Poole's statement evidences the fact that the City's policy was inconsistently enforced. However, even assuming arguendo that Plaintiff's recount of what Officer Poole said does not constitute inadmissible hearsay, Plaintiff has failed to present the specific facts necessary to withstand summary judgment. *See, e.g., Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456–57 (4th Cir.1989) (explaining that unsupported beliefs are irrelevant). Specifically, summary judgment is appropriate as to this claim because Plaintiff has not presented any specific evidence identifying any Police Department employee who was not required to submit medical information as a condition of employment. *See, e.g.,*

*McKiver v. General Elec. Co.*, 11 F.Supp.2d 755, 758–59 (M.D.N.C.1997) (explaining that the plaintiff failed to make out her prima facie case of discrimination where she presented no evidence that the defendant "hired or retained applicants who failed to comply with company policy and procedures"). In fact, the City has produced evidence to the contrary that shows that *all* prospective employees who have been offered positions with the Police Department have been required to present medical information as part of their conditional offers of employment. [Bell's Letter to Ihekwu, Ihekwu Dep.Ex. 7].

Although Plaintiff's burden at the summary judgment stage is not an onerous one, the Fourth Circuit has consistently held that general allegations of discriminatory practice without descriptions of specific incidents are not sufficient evidence from which a jury could reasonably conclude that a plaintiff has established a prima facie case of discrimination. *See, e.g., Taylor v. Virginia Union Univ.*, 193 F.3d 219, 234 (4th Cir.1999) (concluding that a Corporal's testimony on the plaintiff's behalf that unidentified male police officers were not treated similarly for engaging in the same general behavior as that for which the plaintiff was punished was not sufficiently specific evidence from which a jury could conclude that the plaintiff had established the elements of a prima facie case of sex discrimination), *cert. denied*, 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000); *Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir.1990) (concluding that general allegations without descriptions of specific incidents are insufficient to establish a discrimination claim under Title VII); *see also McKiver*, 11 F.Supp.2d at 758 (explaining that where a plaintiff has no specific evidence to support an inference of discrimination, she fails to make out her prima facie case). Given the standard established by the Fourth Circuit as to what a Plaintiff must present to withstand summary judgment, Plaintiff's general allegations of discriminatory conduct, without more than an alleged and unsubstantiated statement by Officer Poole, who merely expressed his belief about the Police Department's procedures, do not suffice to withstand summary judgment.

Second, Plaintiff also offers the City's hiring procedure pamphlet in support of his position that the City does not require all employees to submit medical information as a condition of employment. According to Plaintiff, the pamphlet only requires "the police who would be having contact with the public, in terms of if something happens" to submit medical history before being hired. [Ihekwu Dep. p. 112]. Therefore, Plaintiff asserts that, as a prospective Records Clerk, he was excluded from the medical information requirement because he would have had no contact with the public. The problem with Plaintiff's assertion, however, is that it conflicts with later testimony given by Plaintiff in his deposition. The conflict arises to the extent that Plaintiff alleges that the City was involved in a conspiracy to effect his termination. Plaintiff contends that in conspiring against him, the City knew of his past refusal to submit medical information to an Employee Assistance Program counselor. Thus, according to Plaintiff, the only reason that the City offered him the Police Department Records Clerk position is because the City knew that the Plaintiff would likely refuse to submit his medical history as a condition of employment. In support of his conspiracy argument, Plaintiff acknowledges in his deposition that the Police Department maintained a policy of requiring from all conditional applicants medical information as part of the background check process. [Ihekwu Dep. pp. 124–25, 129]. Plaintiff's conspiracy argument is obviously inconsistent with his alleged interpretation of the City's hiring manual to the extent that he alleges that the manual excluded him from having to provide medical information. On its face, Ihekwu's deposition testimony appears to support Plaintiff's knowledge of the fact that the City required medical informa-

tion of all prospective Police Department employees. It is a "well established" principle that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 198 (4th Cir.1997) (internal quotation marks omitted). Moreover, even assuming, as Plaintiff alleges, that the pamphlet does state that only employees who come in contact with the public are required to submit medical history, Plaintiff still has presented no evidence that this procedure was employed in an inconsistent manner with respect to his application. *See, e.g., Baird v. Rose*, 192 F.3d 462, 468 (4th Cir.1999) (explaining that "the application of a neutral rule that applies to disabled and non-disabled individuals alike cannot be considered discrimination on the basis of disability"); *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1032, 1036 (6th Cir.1995) (same). Plaintiff has presented no specifics as to incidents in which other administrative employees were excused from submitting medical history as a prerequisite to employment with the Police Department. *See, e.g., McKiver*, 11 F.Supp.2d at 759 (noting that if a plaintiff fails to present evidence showing that company policies are inconsistently applied, the plaintiff fails to establish a prima facie case of discrimination). "While [an ADA] plaintiff may present direct and indirect evidence to support a claim of discrimination, neither speculative assertions, possibilities of factual disputes, nor a scintilla of evidence in support of [a plaintiff's] position will suffice." *Afande v. National Lutheran Home for the Aged*, 868 F.Supp. 795, 802 (D.Md.1994) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), *aff'd*, 69 F.3d 532 (4th Cir.1995); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). For the foregoing reasons, notwithstanding Plaintiff's interpretation of the hiring procedures pamphlet, this Court does not find that Plaintiff has presented even a scintilla of evidence as to any discriminatory effect of the City's hiring policy sufficient to withstand summary judgment.

Lastly, in support of Plaintiff's claim that Defendant did not require medical information of all employees, Plaintiff asserts that an unidentified City official told Plaintiff's lawyer that Plaintiff did not have to submit his medical information as part of his application. However, even assuming again that Plaintiff's allegation is not hearsay, Plaintiff has not provided any specifics as to when this alleged conversation took place, who it took place with, or any other details that would be specific enough to allow a jury to reasonably conclude in the Plaintiff's favor. *See, e.g., McKiver*, 11 F.Supp.2d at 759 (explaining that the court would not consider a statement by an unknown declarant as evidence of discrimination where the plaintiff had no personal knowledge about the context in which the statement was made). As previously stated, unsupported assertions, such as the ones made by Plaintiff as to the requirements of the City's hiring policy, are not evidence sufficient to withstand summary judgment. *See Ennis v. National Ass'n of Business & Educational Radio*, 53 F.3d 55, 61 (4th Cir.1995) (instructing that " '[g]enuineness means that the evidence must create a fair doubt; wholly speculative assertions will not suffice' ") (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985)); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (guiding that mere unsupported speculation is not enough to defeat a summary judgment motion). For the foregoing reasons, the Court does not find that Plaintiff has met his burden of establishing that Defendant inconsistently required medical information of Police Department employees in violation of the ADA. Therefore, Defendant's Motion for Summary Judgment as

to Plaintiff's refusal to hire claim is GRANTED.

## 2. Decentralization of the RMD and Discriminatory Failure to Hire

■ As to Plaintiff's more general assertions that the City violated his civil rights by decentralizing his department and offering him undesirable jobs to effect his termination, the Court finds that Plaintiff has failed to meet his burden of proof as to these issues. Plaintiff has failed to present sufficient evidence from which a jury could reasonably conclude that the City decentralized Plaintiff's department and then terminated him for a discriminatory purpose. In this case, to find in Plaintiff's behalf, the trier of fact would have to infer from the Plaintiff's previous refusal to submit his medical information to an EAP counselor that the City knew that Plaintiff would also refuse to submit his medical information as a condition of employment with the Police Department. From this inference, the trier of fact would then have to deduce that the City decentralized the RMD solely in order to effect the termination of Plaintiff's employment. However, despite Plaintiff's suggestion that discrimination can be inferred in this way, "[t]he building of one inference upon another [does] not create a genuine issue of material fact." *Ennis*, 53 F.3d at 62 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)); *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 362 (4th Cir.1983) (noting that "leaps of inference [cannot] be made under the legal constraints imposed by applicable proof burdens and the requirements of demonstrable rationality in the fact-finding process"), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985); *McClamb v. Rubin*, 932 F.Supp. 706, 712 (M.D.N.C.1996) (explaining that a plaintiff cannot survive summary judgment through mere speculation or the building of one inference upon another) (internal quotation marks omitted).

Moreover, other factors presented to the Court suggest that the City did not decentralize the RMD for the purpose of discriminating against Plaintiff. In fact, by Plaintiff's own acknowledgment, the City sought to reduce the workforce of the RMD and defer that labor to other departments to reduce costs. [Ihekwu Dep. p. 42]. Specifically, Defendant has presented evidence that it decentralized the RMD as part of an efficiency control scheme, and not as part of some grander conspiracy to effect Plaintiff's termination. Given this proffer of a legitimate explanation for the City's actions, without evidence of pretext for discriminatory termination, this Court will not act as a "super-personnel department that re-examines an entity's business decisions." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997) (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987)).

■ As to Plaintiff's claim that the City refused to offer him other, more desirable positions in violation of the ADA, Plaintiff has failed to present any evidence that would suggest unlawful discrimination. As mentioned earlier, for Plaintiff to establish a claim for discriminatory refusal to hire, Plaintiff must establish that his employer had an open position for which Plaintiff applied or sought to apply; that Plaintiff was otherwise qualified for the position; and that the City's failure to place Plaintiff gives rise to a reasonable inference of unlawful discrimination. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Shafer v. Preston Memorial Hosp. Corp.*, 107 F.3d 274, 276 (4th Cir.1997). In this case, Plaintiff has presented no evidence as to: (1) the other positions that were available at the time of decentralization; (2) whether he was qualified for such available positions; (3) whether others without his malady were placed in the positions about which he complains; and (4) the qualifications of such unnamed others relative to Plaintiff's own qualifications. Thus, Plaintiff has failed to show that he "was treated differently than com-

parably qualified employees outside the protected class." *McClamb,* 932 F.Supp. at 718. Because Plaintiff has failed to provide the necessary specifics to make out a prima facie case of discriminatory refusal to hire, Defendant's Motion with respect to this aspect of Plaintiff's ADA claim is GRANTED.

### 3. Blacklisting

■ Lastly, Plaintiff asserts in support of his broader conspiracy claim that the City violated the ADA by blacklisting him, or including medical information in his personnel file, and that this conduct by the City prohibited him from getting another job. The ADA does require that medical information obtained by an employer be collected and maintained in separate medical files and that it be treated as a confidential medical record. *See* 42 U.S.C. § 12112(d)(4)(C). However, Plaintiff has failed to produce sufficient information from which this Court could reasonably conclude that this provision of the ADA has been violated. In support of his allegation that Defendant placed medical information in his personnel file, Plaintiff simply relies on a hearsay statement by an unspecified EEOC representative, a conclusory statement by the EEOC, and the fact that he was unable to gain other desirable employment in support of his blacklisting claim.[3] In addition, Defendant has presented evidence that shows that all medical records were maintained separately from employee personnel files during the time period about which Plaintiff complains. [Bell Aff. ¶ 4]. Therefore, even construing the evidence in the light most favorable to Plaintiff, Plaintiff has again failed to present specific, non-conclusory, admissible evidence giving rise to a reasonable inference of disability discrimina-

tion. *See, e.g., Taylor v. Virginia Union Univ.,* 193 F.3d 219, 234 (4th Cir.1999) (explaining that an inadmissible hearsay statement by an unidentified person is "too vague" to state a claim for discrimination), *cert. denied,* 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000). In fact, Plaintiff has presented no evidence as to the specific positions for which he applied after he was terminated, the qualifications necessary for such positions, whether employers placed other interviewees in said positions for which Plaintiff interviewed, or the qualifications of those hired. Thus, without more from which to conclude that Plaintiff was refused employment subsequent to his termination, based upon discriminatory conduct by the City, a reasonable juror could not conclude that such alleged blacklisting occurred. Therefore, Plaintiff's general assertions of blacklisting without supporting evidence giving rise to a reasonable inference of misconduct are insufficient to withstand summary judgment. *See, e.g., Simpson v. Welch,* 900 F.2d 33, 35 (4th Cir.1990) (explaining that where a plaintiff has failed to set forth specifics as to jobs to which she was entitled but did not receive, summary judgment is proper); *McKiver v. General Elec. Co.,* 11 F.Supp.2d 755, 759 (M.D.N.C.1997) (explaining that inadmissible hearsay and unsupported beliefs of discrimination are irrelevant and not sufficient for summary. judgment purposes).

### C. *Hostile Work Environment Claim*

■ Defendant also moves for Summary Judgment as to Plaintiff's Hostile Work Environment claim. Defendant alleges that Summary Judgment is proper as to this claim because Plaintiff failed to follow the administrative requirements necessary to properly bring his hostile work environ-

---

**3.** After investigating the Plaintiff's claim, and prior to entering into a conciliation agreement with the City, the EEOC issued a Determination in which it concluded that the City had included medical information in the Plaintiff's personnel file in violation of the ADA. [EEOC Determination, Ihekwu Aff., Ex.

4]. However, this Determination is conclusory in nature. Without knowing on what the EEOC relied in drawing its conclusion, this Court is reluctant to afford the EEOC's determination great weight because this Court must conduct its own independent investigation based upon the evidence presented.

ment claim before this Court. Failure to follow the administrative requirements in an ADA case renders the alleged discriminatory occurrence without legal conse-' quence. *See Davis v. North Carolina Dep't of Corr.*, 48 F.3d 134, 136 (4th Cir.1995); *McClamb*, 932 F.Supp. at 712. *But see Edelman v. Lynchburg College*, 228 F.3d 503, 511 (4th Cir.2000) (explaining that the administrative requirements may be waived, estopped, or equitably tolled under certain circumstances).

■ Because the ADA was fashioned after Title VII, the powers, remedies, procedures, and standards of Title VII govern a hostile work environment claim under the ADA. *See E.E.O.C. v. Waffle House, Inc.*, 193 F.3d 805, 809 (4th Cir.1999); *Davis*, 48 F.3d at 136; *see also Shiflett v. GE Fanuc Automation Corp.*, 151 F.3d 1030, 1998 WL 386116, *4 (4th Cir.1998) (unpublished) (using the Title VII standard to analyze a hostile environment claim under the ADA). Under Title VII and the ADA, an administrative charge must be filed within 180 days if initially filed with the EEOC and within 300 days if initially filed with a deferral agency. 42 U.S.C. § 2000e–5(e)(1). Plaintiff's initial charge of discrimination was based upon his claim of refusal to hire, and it was filed within the requisite time period. However, the present issue is whether Plaintiff's hostile work environment claim, which Plaintiff filed as an amendment to his initial charge, was filed in a timely manner.

Plaintiff raised the present claim of hostile work environment in an amended

Complaint dated May 4, 1998. Even construing the facts in the light most favorable to Plaintiff, the latest date on which the alleged harassment took place was in February 1997. [Ihekwu Dep., Vol. II, pp. 48–49]. It was at that point that Plaintiff took a leave of absence from his department. Plaintiff admits that, even with respect to the harassing conduct he complained of, most of the persons accused of the harassment were dismissed immediately upon his return from leave. Plaintiff also states that he was not subjected to any additional harassment upon his return to his employment. Moreover, the timing of the last specific harassing incidents alleged by Plaintiff in both his letter to Parker and in his deposition took place some time in February of 1997.[4] Given the last date on which Plaintiff was allegedly subjected to harassment and the date on which Plaintiff first filed his harassment charge with the EEOC, the only evidence presented reveals that Plaintiff did not file his hostile work environment claim in a timely manner under the administrative regulations.[5] Therefore, unless Plaintiff's amended charge alleging harassment relates back to the date of Plaintiff's initial charge, Plaintiff's harassment claim is time-barred. 29 C.F.R. § 1626.8(c); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir.1996).

■ The Fourth Circuit has adopted the EEOC regulations with respect to relation back. According to the EEOC regulations:

---

4. In an affidavit taken after Plaintiff's deposition, Plaintiff made statements inconsistent with his deposition testimony as to the date on which the harassment ceased. In Plaintiff's affidavit, he claims that upon return from his leave, the harassment continued until the point of decentralization. However, because by Plaintiff's own admission most of his alleged tormentors were terminated upon his return and because Plaintiff has failed to allege any specific harassing event that occurred after February, this Court adopts for fact-finding purposes the statement made by Plaintiff in his deposition.

5. Plaintiff's claim was not filed in a timely manner because Plaintiff failed to file his claim within 180 days of the last specifically alleged harassing event, or by the beginning of September 1997 (180 days from the beginning of February 1997). Plaintiff did not file his claim alleging hostile work environment until May 1998, a period substantially later than the filing deadline. Even using the more lenient 300-day deadline, Plaintiff failed to file his claim in a timely manner.

A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments *and amendments alleging additional acts* which constitute unlawful employment practices *related to or growing out of the subject matter* of the original charge will relate back to the date the charge was first received. 29 C.F.R. § 1601.12(b) (1988). Given the language of the regulation, the Fourth Circuit has instructed that "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit." *Evans*, 80 F.3d at 963 (citing *King v. Seaboard Coast Line, R.R.*, 538 F.2d 581, 583 (4th Cir.1976); *Lawson v. Burlington Indus.*, 683 F.2d 862, 863–64 (4th Cir.1982), *cert. denied*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982); *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993)).

■ Plaintiff's original charge alleged only disability discrimination based upon Defendant's refusal to hire Plaintiff for the Police Department Records Clerk position. Moreover, the charge failed to mention hostile work environment and failed to allege that hostile work environment was a factor in Plaintiff's disability discrimination claim. Therefore, Plaintiff's hostile environment claim cannot relate back based solely upon what was alleged in the original charge. However, in the Charge Questionnaire supporting Plaintiff's original claim, Plaintiff reported the following facts: (1) that he tested HIV positive, (2)

that his employer knew about his HIV status, and (3) that his co-workers subjected him to insults and discriminated against him based upon his HIV status. Plaintiff also reported that he complained of the discrimination to his supervisor, but that the discrimination and insults failed to cease.

■ It is well settled in this Circuit that "[a]n administrative charge of discrimination does not strictly limit an [ADA] suit which may follow; rather the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981) (citing *Equal Employment Opportunity Comm'n v. General Elec. Co.*, 532 F.2d 359 (4th Cir. 1976)); *Lane v. Wal–Mart Stores East, Inc.*, 69 F.Supp.2d 749, 755 (D.Md.1999); *see also Dennis v. County of Fairfax*, 55 F.3d 151, 156–57 (4th Cir.1995) (dismissing the appellant's hiring, promotion, and training claims because the appellant did not include them in his EEOC Complaint and because such claims would not have arisen from an investigation of the appellant's complaint).[6] In this case, the Court finds that a reasonable investigation of Plaintiff's Complaint would have led to an investigation of his harassment claim. Indeed, the Court finds this case to be analogous to *Afande v. National Lutheran Home for the Aged*, 868 F.Supp. 795 (D.Md.1994), *aff'd*, 69 F.3d 532 (4th Cir. 1995), in which the district court permitted the plaintiff's claim of discriminatory working environment to stand, despite the fact

---

6. In determining the proper scope of an employment discrimination complaint, a court must balance two competing strategies.

The first is that Title VII is a broad remedial statute designed to protect those who are the least able to protect themselves. An individual who files a discrimination charge seldom has the assistance of counsel and is not expected to articulate the entire range of allegedly discriminatory practices of which he feels he is a victim.... The sec-

ond policy is that Title VII plaintiffs should not have an unrestrained ability to litigate allegations of discrimination which are neither contained in the EEOC charge nor investigated by the EEOC, thereby frustrating the statutory scheme of informal persuasion and voluntary compliance.

*Hubbard v. Rubbermaid, Inc.*, 436 F.Supp. 1184, 1188–89 (D.Md.1977) (citations omitted).

that her administrative charge mentioned only discriminatory termination. In *Afande,* the court placed particular emphasis on the fact that the EEOC's records included an affidavit from the plaintiff, in which the plaintiff made ·allegations regarding the working environment. *See id.* at 800. According to the court, the EEOC used the information in its records "to shape its investigation," and as such, the working environment charge reasonably stemmed from the EEOC's investigation. *See id.* For that reason, the *Afande* court found that the plaintiff's claim related back to her initial charge. Likewise, in this case, the EEOC's records included allegations of the harassment to which Plaintiff was subjected while working for Defendant. As such, this Court finds that Plaintiff's harassment claim relates back to the date of the original charge. However, for Plaintiff's claim to properly be heard before this Court, Plaintiff must also allege that some specific incident of harassment occurred within the relevant period, or within 180 days before the original charge. *See Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997). Because the last specific event of harassment of which Plaintiff complains occurred sometime in early February 1997, and because Plaintiff's original charge is dated January 1998, Plaintiff did not allege a specific event of harassment within 180 days of the original charge. Thus, Plaintiff's hostile working environment claim is time-barred, despite its relation back.[7] For the foregoing reasons, Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claim is GRANTED.

## D. *Title VII Race Discrimination Claim*

■ Without addressing Plaintiff's ability to establish a prima facie case un-der Title VII, Defendant asserts at the outset that Plaintiff failed to timely file charges with the EEOC with respect to his race discrimination claim. In fact, Defendant contends that Plaintiff failed to file an EEOC charge as to this claim at all. This Court agrees.

In the charges Plaintiff filed with the EEOC, Plaintiff only alleged disability discrimination in his original Complaint and harassment based upon his disability in his amended Complaint. Because the allegations contained in the Plaintiff's EEOC charge serve to limit the scope of Plaintiff's civil Complaint, only those discrimination claims "stated in the initial charge, those reasonably related to it, or those developed by reasonable investigation of it may be maintained in a subsequent Title VII lawsuit." *Evans,* 80 F.3d at 963. Because Plaintiff's initial charge fails to mention race discrimination, this matter may come before the Court only if the claim is reasonably related to Plaintiff's original charge of disability discrimination or if the Title VII claim of racial discrimination would be developed by reasonable investigation of Plaintiff's disability discrimination claim. *See id.* Here, neither Plaintiff's original charge nor the EEOC Charge Questionnaire makes any mention of race discrimination. Moreover, because the investigation of race discrimination is not within the reasonable scope of investigation of a disability discrimination claim, this Court finds that Plaintiff's race discrimination claim does not relate back to Plaintiff's original charge. *See, e.g., Conroy v. Boston Edison Co.,* 758 F.Supp. 54, 59–60 (D.Mass.1991) (explaining that permitting a late amendment to allow an entirely

---

7. Defendant also asserts that Plaintiff has failed to prove that the alleged harassing events constitute a continuing violation. Accordingly, Defendant further alleges that all events occurring outside of the relevant 180 days before the original charge are time-barred and not properly before this Court. Although the Fourth Circuit has noted, in support of Defendant's argument, that all

"[i]ncidents outside of the statutory window are time-barred" unless they can be related to a timely incident as a "series of separate but related acts" amounting to a continuing violation, *Beall,* 130 F.3d at 620, the Court need not address this argument because Plaintiff has failed to allege a timely harassing incident, as is required for the continuing violation theory to apply.

new theory of recovery "would eviscerate the administrative charge filing requirement altogether"); *Evans,* 80 F.3d at 963 (same). Therefore, to the extent that Plaintiff attempts to raise a race discrimination claim as a part of his disability discrimination claim, the Court finds that Plaintiff's race discrimination claim is not properly before this Court. For the foregoing reasons, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII race discrimination claim is GRANTED.

### E. *Section 1981 Claim*

Plaintiff also asserts a race discrimination claim under section 1981, alleging that Defendant unconstitutionally discriminated against Plaintiff because Plaintiff is a Black Nigerian. Although section 1981 does not itself use the word "race," the Supreme Court has construed the statute as forbidding all racial discrimination in the making of public and private contracts. *See Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). Although Defendant acknowledges that section 1981 prohibits discrimination on the basis of race, Defendant contends that Plaintiff has not alleged a race discrimination claim, but, has, instead, alleged a national origin discrimination claim, which is not covered within the statute's protective umbrella. *See, e.g., Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987), *reh'g denied,* 483 U.S. 1011, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987); *Chandoke v. Anheuser–Busch, Inc.,* 843 F.Supp. 16, 18 (D.N.J.1994).

 Defendant argues that there can be no race discrimination in this case because of the fact that Plaintiff's tormentors were of the same skin color as Plaintiff. However, contrary to Defendant's contentions, it is possible for an African–American employee to racially discriminate against a Nigerian born employee "who shares the same skin color," but who altogether differs in "cultural norms, language, and other more superficial traits."

*Holness v. Penn State Univ.,* 1999 WL 270388 (E.D.Pa.1999). The Court finds the reasoning in *St. Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), and *Holness v. Penn State University,* 1999 WL 270388 (E.D.Pa.1999), to be instructive as to this point. In *St. Francis College,* the United States Supreme Court concluded that discrimination based upon a person's ancestry or ethnic characteristics is racial discrimination and, thus, is covered by section 1981. 481 U.S. at 613, 107 S.Ct. at 2028 (concluding that section 1981 covers discrimination against an individual because "he is a part of an ethnically and physiognomically distinctive sub-grouping of persons"). Likewise, in *Holness,* the United States District Court for the Eastern District of Pennsylvania concluded that an African–American supervisor could discriminate against a Jamaican-born employee because race is "not limited to a person's skin tone." 1999 WL 270388, at *6. Relying on the logic in *Saint Francis College* and *Holness* and viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether Plaintiff was subjected to racial discrimination because of his Nigerian ancestry.

 Despite the Court's finding that a genuine issue of material fact exists as to whether Plaintiff was subjected to racial discrimination by his African–American co-workers, the issue remains as to whether Plaintiff can properly hold the City accountable for his section 1981 claim. Section 1983 is the enforcement vehicle for all race discrimination claims under section 1981. *See* 42 U.S.C. § 1983; *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733–37, 109 S.Ct. 2702, 2722–24, 105 L.Ed.2d 598 (1989) (explaining that section 1983 provides the exclusive federal remedy for the violation of rights guaranteed by section 1981). Thus, for Plaintiff to recover against the City in this case based upon his section 1981 allegation, Plaintiff must also properly establish municipal liability under sec-

tion 1983. In enacting section 1983, Congress did not intend to impose liability on a municipality for a violation of a plaintiff's constitutional rights, unless deliberate action attributable to the municipality itself was the "moving force" behind the plaintiff's deprivation. *Board of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2027, 56 L.Ed.2d 611 (1978)), *reh'g denied,* 520 U.S. 1283, 117 S.Ct. 2472, 138 L.Ed.2d 227 (1997). As is evidenced by *Monell,* a municipality is subject to section 1983 liability only if "[the municipality] causes … a deprivation [of plaintiff's federal rights] through an official policy or custom." *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999); *see also Monell,* 436 U.S. at 694, 98 S.Ct. at 2027 (noting that locating a policy ensures that a municipality will be held liable only for those acts that can be said to fairly represent those of the municipality). Given the confines of section 1983, a municipality may not be held liable simply because it employs one or more tortfeasors. *See Carter,* 164 F.3d at 218; *Monell,* 436 U.S. at 690–94, 98 S.Ct. at 2036–37, 56 L.Ed.2d 611 (1978) (explaining that a municipality cannot be held vicariously liable for the acts of its employees merely because of the existence of an employer-employee relationship). However, a municipality may be held liable under a theory of deliberate indifference or tacit authorization, even where an official policy or custom of discrimination does not exist, if a municipal official with authority to make policy or to take corrective action made a decision "that reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision." *Board of County Comm'rs,* 520 U.S. at 404, 117 S.Ct. at 1388 (1997); *see also Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir. 1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *Clipper v. Takoma Park, Maryland,* 876 F.2d 17, 20 (4th Cir.1989), *reh'g denied,* 898 F.2d 18 (4th Cir.1989); *Jones v. Ziegler,* 894 F.Supp.880, 889 (D.Md.1995) (addressing the deliberate indifference theory in the context of police misconduct), *aff'd,* 104 F.3d 620 (4th Cir.1997). Thus, under certain limited circumstances, a municipality may be held accountable for the acts of its employees. Given the various standards of determining municipal liability, the Court next turns to Plaintiff's potential claim of municipal liability against Defendant.

 In this case, Plaintiff has failed to establish that the City had an official policy or custom of racial discrimination in violation of section 1981. In fact, Plaintiff makes no such allegation and presents no evidence as to such a policy. Instead, Plaintiff indirectly suggests that Defendant is liable based upon the deliberate indifference or tacit authorization theory. Even assuming that Parker qualifies as a City official with the requisite authority to remedy Plaintiff's situation, Plaintiff's reliance on the deliberate indifference theory is, nonetheless, fatally flawed, because in a deliberate indifference analysis, an ineffective, negligent, imprudent, or erroneous response by an official does not give rise to municipal liability. *See, e.g., Jones v. Wellham,* 104 F.3d 620, 627 (4th Cir.1997) (explaining that neither imprudence nor legal negligence suffice to constitute deliberate indifference); *Riddick v. School Bd. of the City of Portsmouth,* 230 F.3d 1353, 2000 WL 1359663, *6 (4th Cir.2000) (unpublished); *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 762 (5th Cir.1993) (holding that the Board's decision, though negligent and inconsistent with past handling of similar matters, was not sufficient to establish deliberate indifference), *reh'g denied,* 20 F.3d 471 (5th Cir.1994); *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 219 (5th Cir.1998) (noting that the fact that an official made a "tragic error in judgment does not create a genuine issue of material fact as to whether she acted with deliberate indifference toward [the plaintiffs'] constitutional rights"); *see also Gebser v.*

*Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 2000, 141 L.Ed.2d 277 (1998) (explaining that an *"official* decision by the recipient *not to remedy* the violation is required") (emphasis added). In the present case, Plaintiff admits that Parker responded to his complaints of discrimination on various occasions. In fact, Plaintiff admits that Parker held a number of meetings with Plaintiff's alleged tormentors in which the conduct complained of was discussed and discouraged. [Ihekwu Dep. pp. 104, 109; Ihekwu Dep., Vol. II, p. 37].[8] Notwithstanding Plaintiff's present complaints of delay and inadequate response by Parker to Plaintiff's claims of harassment, Parker's conduct in his official capacity on behalf of Defendant did not amount to deliberate indifference in the form of an outright refusal to respond or a tacit authorization of the discriminatory practices alleged by Plaintiff. For the foregoing reasons, Plaintiff cannot establish a section 1981 claim against Defendant either based upon a custom or policy of racial discrimination or based upon a theory of deliberate indifference. Therefore, Defendant's Summary Judgment Motion as to Plaintiff's section 1981 claim is GRANTED.

### F. *Due Process Claim*

■ Plaintiff also alleges a Due Process claim to the extent that he had a right to continued employment and that Defendant violated that right by terminating his employment with the City. However, to assert a Due Process violation claim under the Fourteenth Amendment of the United States Constitution, Plaintiff must show first that he has a protected property interest, "and only then will courts consider his contention that the process he received was inadequate." *Wuchte v. McNeil*, 130 N.C.App. 738, 740, 505 S.E.2d 142, 144 (1998); *Soles v. City of Raleigh Civil Service Co.*, 345 N.C. 443, 446, 480 S.E.2d 685, 687, *reh'g denied*, 345 N.C. 761, 485 S.E.2d

299 (1997). Whether a property right to continued employment exists is governed by state law. *See Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976).

■ Under North Carolina law, an employee is presumed to be an employee-at-will absent a definite term of employment or a contract condition that provides for "for cause" termination only. *See Still v. Lance*, 279 N.C. 254, 259, 182 S.E.2d 403, 406 (1971). An employee-at-will can be terminated for any or no reason, so long as the reason for termination does not violate public policy. *See Wuchte*, 130 N.C.App. at 739, 505 S.E.2d at 144.

■ An employee whose employment would otherwise be at-will may "gain a recognizable interest in continued employment where such a right is granted by ordinance or implied contract." *Id.* at 741, 505 S.E.2d at 144. Employment manuals and policy memoranda may establish such an interest if "they are expressly included in the employee's employment contract, or in the case of local governments, enacted as ordinances." *Id.* (citing *Howell v. Town of Carolina Beach*, 106 N.C.App. 410, 417, 417 S.E.2d 277, 281 (1992)); *Trought v. Richardson*, 78 N.C.App. 758, 760, 338 S.E.2d 617, 618, *disc. rev. denied*, 316 N.C. 557, 344 S.E.2d 18 (1986).

■ Plaintiff alleges that the City's ordinance, which gave Plaintiff non-probationary, permanent status, vested him with a due process right to continued employment. Plaintiff points to *Howell v. Town of Carolina Beach*, 106 N.C.App. 410, 417, 417 S.E.2d 277, 281 (1992), in support of this allegation. However, as explained by the North Carolina Supreme Court in *Howell v. Commercial Credit Corp.*, 238 N.C. 442, 78 S.E.2d 146 (1953), and the North Carolina Court of Appeals in *Lorbacher v. Housing Authority of the City of Raleigh*, 127 N.C.App. 663, 674, 493 S.E.2d 74, 80–81 (1997), "[e]ven when an employee

---

**8.** At one point in his deposition, Plaintiff even notes that Parker had taken "concrete action"

against his co-workers for the way that they had treated him. [Ihekwu Dep. p. 109].

is hired on a permanent basis, the relationship is still terminable at the will of either party." 127 N.C.App. at 674, 493 S.E.2d at 81 (citing *Commercial Credit Corp.*, 238 N.C. at 443–44, 78 S.E.2d at 147).[9] Thus, based on the reasoning in *Commercial Credit Corp.* and *Lorbacher*, permanent status, in itself, does not create a reasonable expectation of continued employment and remove Plaintiff from the employee-at-will category. To remove himself from this category, Plaintiff must show that the ordinance on which he relies restricts termination of his employment to "for-cause" discharge only. *See Lorbacher*, 127 N.C.App. at 674, 493 S.E.2d at 80–81. Because Plaintiff has not made such a showing, and because Plaintiff has failed to allege a property interest protected by the Due Process Clause of the United States Constitution, Defendant's Motion for Summary Judgment as to Plaintiff's Due Process claim is GRANTED.[10]

## III. *CONCLUSION*

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claims for violation of 42 U.S.C. § 12112, et seq., 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and the Due Process Clause of the Fourteenth Amendment. Furthermore, because the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's federal claims, the Court will not consider Defendant's Motion for Summary Judgment as to Plaintiff's remaining state law claims. Instead, pursuant to 28 U.S.C. § 1367(c)(3), the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss the state law claims without prejudice.

An Order and Judgment consistent with this MEMORANDUM OPINION will be filed contemporaneously herewith.

---

9. This Court has distinguished *Lorbacher* on grounds unrelated to this case. *See Buser v. Southern Food Service, Inc.*, 73 F.Supp.2d 556, 573 (M.D.N.C.1999).

10. This Court need not address whether Plaintiff was terminated under the public policy violation exception to the employment-at-will standard because Plaintiff did not assert that this exception applied and because this Court has found that Plaintiff failed to establish that he was terminated for a discriminatory purpose.